ST. PAUL, MINNEAPOLIS & MANITOBA RAILWAY COMPANY *v.* DONOHUE.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 440.  Submitted January 10, 1908.—Decided May 4, 1908.

A homesteader who initiates a right to either surveyed or unsurveyed land and complies with the legal requirements may, when he enters the land, embrace in his claim land in contiguous quarter-sections if he does not exceed the quantity allowed by law and provided that his improvements are upon some portion of the tract, and that he does such acts as put the public upon notice as to the extent of his claim. *Ferguson* v. *McLaughlin*, 96 U. S. 174, distinguished.

Under the land grant act of August 5, 1892, 27 Stat. 390, chap. 382, the right of the railway company to select indemnity lands, non-mineral and not reserved and to which no adverse right or claim had attached or been initiated, does not include land which had been entered in good faith by a homesteader at the time of the supplementary selection, and on a re-

linquishment being properly filed by the homesteader the land becomes open to settlement and the railway company is not entitled to the land under a selection filed prior to such relinquishment.
101 Minnesota, 239, affirmed.

THE facts are stated in the opinion.

*Mr. Thomas R. Benton* for plaintiff in error:

The right of Hickey under the homestead laws had not attached or been initiated to the land in controversy prior to and at the time of the selection of the land by the railway company under the act of August 5, 1892.

Hickey never in fact settled or resided upon, occupied or improved, or in any manner indicated an intention to claim the land in controversy under the homestead law, or otherwise, prior to the selection thereof by the railway company.

Hickey's settlement, improvement and occupation of lot 15 of section 4, was not a settlement, improvement or occupation of the land in dispute and was not a bar to the railway company's selection of the latter.

A settlement upon any part of a quarter-section is in legal effect a settlement upon that entire quarter section, *Quinby* v. *Conlan,* 104 U. S. 420, but a settlement on part of one quarter section is not in legal effect a settlement upon another quarter section or another section. *Ferguson* v. *McLaughlin,* 96 U. S. 174; *Reynolds* v. *Cole,* 5 L. D. 556; *Brown* v. *Cent. Pac. R. R. Co.,* 6 L. D. 151; *U. Pac. R. R. Co.* v. *Simmons,* 6 L. D. 172; *Hemsworth* v. *Holland,* 7 L. D. 76; *Pooler* v. *Johnson,* 13 L. D. 134; *Staples* v. *Richardson,* 16 L. D. 248; *Peasley* v. *Whitney,* 18 L. D. 356; *Perry* v. *Haskins,* 23 L. D. 50; *Kenny* v. *Johnson,* 25 L. D. 394.

Hickey's homestead claim was not presented to the district land officers until after the allowance of the railway selection. It was subsequently relinquished and canceled and was not, therefore, a bar to the railway selection. *Northern Pacific R. R. Co.* v. *Dean,* 27 L. D. 462; *Northern Pacific R. R. Co.* v. *Fly,* 27 L. D. 464; *Oregon &c. R. R. Co.* v. *United States,* 190 U. S. 186; *Shepley* v. *Cowan,* 91 U. S. 330; *Sturr* v. *Beck,* 133 U. S. 541

The entry of the land in controversy by Hickey's heirs was never completed and did not operate to cancel the railway company's selection. *Whitney* v. *Taylor*, 158 U. S. 85; *Norton* v. *Evans*, 82 Fed. Rep. 804; *Wagstaff* v. *Collins*, 97 Fed. Rep. 5.

The allowance of the Hickey homestead entry by the district land officers did not operate to cancel the railway company's selection which was still pending. *Northern Pacific R. R. Co.* v. *Reed*, 27 L. D. 651, cited by the court below, discussed and distinguished.

The abandonment and relinquishment of the Hickey homestead entry did not restore the land in controversy to the public domain and open it to entry by defendant in error under the timber and stone land law. The railway selection was pending and undetermined at the time of the relinquishment and cancellation of the Hickey entry. The land was not, therefore, open to entry by the defendant in error. *New Orleans* v. *Payne*, 147 U. S. 261, 266.

*Mr. John R. Donohue,* defendant in error, *pro se:*

The right of Hickey under the homestead laws of the United States had attached and was initiated to the land in controversy prior to and at the time of the attempted selection of said land by the railway company under the act of August 5, 1892.

The question of Hickey's settlement and occupation was at issue in the Land Department, and was by it found in favor of Hickey; giving to this the most favorable construction possible for the railway company, it was at best a mixed finding of fact and law, and as such was conclusive and controlling upon the court. *Gertgens* v. *O'Connor*, 191 U. S. 237; *Vance* v. *Burbank*, 101 U. S. 514; *Moore* v. *Robbins*, 96 U. S. 530; *Carr* v. *Fife*, 156 U. S. 494; *Stewart* v. *McHarry*, 159 U. S. 643; *Aurora Hill Con. Co.* v. *Mining Co.*, 34 Fed. Rep. 515; *Jefferson* v. *Hun*, 11 Pac. Rep. 351; *Calhoun* v. *Violet*, 47 Pac. Rep. 179.

By reason of Hickey's settlement and the completion of entry by him and his heirs, the land in controversy was segregated from the mass of public land, and was not open for selec-

tion by the railway company, and upon subsequent relinquishment filed, did not inure to the benefit of the railway company, but reverted to the government as public lands open for entry. *Kansas & Pacific Ry. Co.* v. *Dunmeyer*, 113 U. S. 629; *H. & D. Ry. Co.* v. *Whitney*, 132 U. S. 357; *Wilcox* v. *Jackson*, 3 Peters, 498; *Sturr* v. *Beck*, 133 U. S. 541; *Witherspoon* v. *Duncan*, 4 Wall. 210; *United States* v. *Turner*, 54 Fed. Rep. 228; *Fish* v. *N. P. Ry. Co.*, 23 L. D. 15.

The doctrine that a tract of land lawfully appropriated becomes thereafter severed from the mass of public lands, and if relinquished or abandoned reverts to the government, applies as well to indemnity lands as it does to granted lands. See *Nelson* v. *Nor. Pac. Ry.*, 188 U. S. 108; *Oregon Ry.* v. *United States*, 189 U. S. 103; *DeLacy* v. *Nor. Pac. Ry.*, 72 Fed. Rep. 726; *Fish* v. *Nor. Pac. Ry.*, 23 L. D. 15; *Northern Pacific Ry.* v. *Loomis*, 21 L. D. 398; *St. P. & Omaha Case*, 21 L. D. 423; *H. & D. Ry.* v. *Christianson*, 22 L. D. 257; *State of California* v. *So. Pac. Ry.*, 27 L. D. 542; *Prince Inv. Co.* v. *Eheim*, 55 Minnesota, 36; *St. Paul & Sioux City R. Co.* v. *Ward*, 47 Minnesota, 40.

The status of the railway company having been fixed and established at the time of its attempted selection, the lands were not affected by such selections because having been previously segregated, the effect of the relinquishment was not to revive or make valid any claim under the original attempted selection, but upon such relinquishment being filed the land became restored to the great mass of public land and was subject to entry from that time, unaffected by the previous attempted selection by the railway company. *H. & D. Ry.* v. *Whitney*, 132 U. S. 357; *Kansas Pac. Ry.* v. *Dunmeyer*, 113 U. S. 629; *Johnson* v. *Towsley*, 13 Wallace, 72; *United States* v. *Turner*, 54 Fed. Rep. 328; *Perkins* v. *Cent. Pac. Ry.*, 11 L. D. 357; *M., K. & T. Ry.* v. *Troxei*, 17 L. D. 122.

MR. JUSTICE WHITE delivered the opinion of the court.

Jerry Hickey, having the legal qualifications, in March, 1893,

settled upon unsurveyed public land of the United States, situated in the Duluth land district, Minnesota. The land was within the territory in which plaintiff in error, hereafter called the railway company, was entitled to make indemnity selections. This right, however, was limited to land as to which, at the time, "no right or claim had attached or been initiated" in favor of another. Act of August 5, 1892, c. 382, 27 Stat. 390. In the land office of the district aforesaid, two years and eight months after the settlement by Hickey, that is, in December, 1895, the railway company made indemnity selections, embracing not only the land upon which Hickey had built his residence, but all the unsurveyed land contiguous thereto, which under any contingency could have been acquired by Hickey in virtue of his settlement. Seven months after—on July 22, 1896—the official plat of survey of the township in which the lands were situated was filed. On that day Hickey made application to enter the tract, under the homestead laws. This application embraced five contiguous lots, located, however, in different quarter-sections, viz., one lot (No. 12) in section 3, and four lots (Nos. 9, 10, 14 and 15) in section 4. The whole five lots contained in all about one hundred and sixty acres, because lots 14 and 15 were fractional. The improvements made by Hickey were on lot 15.

On the day Hickey filed his application the railway company presented a supplementary list of its selections, conforming them to the survey of the township. Because of the conflict between the claim of Hickey and that of the railway company, a contest ensued. It is unnecessary to recite the vicissitudes of the controversy, the death of Hickey pending the contest, the substitution of his mother as his sole heir, and the proceedings by which the claim of the railway company came to be limited to the lots outside of the fractional quarter-section on which the improvements of Hickey had been made. Suffice it to say that ultimately the Secretary of the Interior decided in favor of the Hickey claim. It was held that the effect of the settlement was to initiate a homestead right as to all the

land claimed in the application to enter, and therefore under the terms of its grant the railway company was precluded from making a selection of the lands in dispute. In reaching this conclusion the Secretary found as a fact that in making his homestead settlement Hickey had plainly manifested his intention to embrace within his homestead the land which he subsequently sought to enter, in such manner as to cause it to be well known to all in the community, as early as 1893, the year of the settlement, what were the boundaries of the tract for which he intended to obtain a patent. 32 Land Dec. 8. In consequence of this final decision the mother of Hickey made a homestead entry for the five lots. Subsequently, in the Cass Lake land district, Minnesota, to which the land had been transferred, the mother of Hickey filed in the local land office a relinquishment of her claim to the entire tract. Simultaneously, Donohue, the defendant in error, filed an application to enter the land under the timber and stone act, and his claim was allowed. The railway company, however, contested, as to the lots other than 14 and 15 in section 4, on the ground that the effect of the relinquishment by the heir of Hickey was to cause the selections which had formerly been rejected to become operative as against the entry of Donohue as to the land outside of the quarter-section on which the improvements of Hickey had been constructed. The contest thus created was finally decided by the Secretary of the Interior in favor of the railway company, and a patent issued to it for the lots in dispute. This proceeding was then commenced in the courts of Minnesota by Donohue to hold the railway company liable as his trustee, upon the ground of error in law committed by the Secretary of the Interior in refusing to sustain his entry. The court below decided in favor of Donohue. 101 Minnesota, 239. Upon this writ of error the correctness of its action is the question for decision.

The errors assigned and the arguments at bar rest upon two contentions: First. That the original decision of the Secretary of the Interior in favor of the Hickey homestead entry was

wrong as a matter of law, because Hickey by his settlement had power to initiate a claim to land only in the fractional quarter-section within which his improvements had been placed, and, therefore, that all the other lands outside of such quarter-section, although embraced in the application for entry, were subject to selection by the railway company, because unappropriated public land of the United States, against which no claim had been initiated. Second. Because even if the decision of the Land Department in favor of the Hickey application was not erroneous as a matter of law the court below erred in not giving effect to the ruling of the department in favor of the railroad company and against the Donohue entry.

To dispose of the first contention requires us to take into view the legislation concerning the right to acquire public lands by preëmptors and homesteaders.

The act of September 4, 1841, c. 25, 5 Stat. 455, together with the supplemental act of March 3, 1843, c. 85, 5 Stat. 619, superseded all earlier statutes, and were the basis of the preëmption laws in force on the repeal of those laws in 1891. The act of September 4, 1841, was entitled "An act to appropriate the proceeds of the sale of the public lands, and to grant preëmption rights," and §§ 10–15 dealt with the subject of preëmption. By § 10 it was provided that one who possessed certain qualifications and made settlement in person upon surveyed public lands subject to be so settled, and who should inhabit and improve the same, and who had or should erect a dwelling thereon, might enter with the register of the land office for the district in which such land might lie, "by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land, . . ." This provision of the statute of 1841 was substantially reënacted in § 2259 of the Revised Statutes. Under the law of 1841 claims to public land might be initiated, prior to record notice, by settlement upon surveyed land subject to private entry, thirty days being allowed the settler within which to

file his declaratory statement with the register of the proper district. Act of September 4, 1841, c. 16, s. 15, 5 St. 457, Rev. Stat. § 2264. Subsequently, where the land settled upon had not been proclaimed for sale the settler was allowed three months in which to file his claim. Act of March 3, 1843, c. 86, s. 5, 5 Stat. 620, Rev. Stat. 2265.

It was not, however, until 1862, that preëmptions were allowed, under proper restrictions, on the unsurveyed public lands generally. Act of June 2, 1862, 12 Stat. 418. By § 7 of that act the settler on unsurveyed lands was not required to make his declaratory statement until three months from the date of the receipt at the district land office of the approved plat of the township embracing his preëmption settlement.

From the beginning the Land Department has construed the preëmption laws as conferring an alternative right either to select a regular quarter-section of 160 acres or the same quantity of land embraced in two or more contiguous legal subdivisions, although in different quarter sections. See circular of September 15, 1841 (1 Lester Land Laws, p. 362). The practice of the Land Office is illustrated in a case passed upon by the Attorney General in 1871. Copp, Land Laws, p. 309. One Shaw filed a declaratory statement embracing tracts situated not alone in different quarter-sections, but in different townships, and aggregating more than 195 acres. From a ruling of the commissioner requiring the preëmptor to select which of the legal subdivisions he would omit from his entry so as to include his principal improvements, preserve the contiguity of the land remaining and approximate to 160 acres, Shaw appealed, and the Secretary of the Interior requested the advice of the Attorney General. In recommending that the decision of the commissioner be affirmed, after calling attention to the fact that the technical quarter-section, through the unavoidable inaccuracy of surveys in adjusting meridians, etc., often exceeded or fell below 160 acres, it was said:

"The preëmption settler has the right under the act of 1841 to enter either one hundred and sixty acres in legal subdivisions

lying contiguous to each other without reference to the quarter-section lines, or he has the right to enter a quarter-section as such, in which case he can take the amount of land contained therein as shown by the official survey. In entering a 'quarter-section,' he cannot, of course, depart from the ascertained lines, but must take one hundred and sixty acres or less, as the case may be.

"In the case under consideration, Shaw claims by legal subdivision, but not according to the lines of a quarter-section. Part of the land is in one township, in sec. 2, and part in another township, in sec. 35. He should be allowed to enter any number of the legal subdivisions contiguous to each other and including his dwelling so that the whole shall not in amount exceed one hundred and sixty acres, but he cannot under the act take more than that amount because the land claimed does not constitute what is legally known as a 'quarter section.' "

On May 15, 1874, the right of a qualified preëmptor to locate a preëmption claim upon land lying in two adjoining townships was expressly recognized in *Preëmption claim of William McHenry,* Copp, Land Laws, p. 295. And these principles, as will hereafter be seen, governed equally as to settlements on unsurveyed as on surveyed land.

The homestead law was enacted on May 20, 1862, c. 75, 12 Stat. 392. By that act, differing from the preëmption law, the rights of the settler only attached to the land from the date of the entry in the proper land office. *Maddox* v. *Burnham,* 156 U. S. 544, 546. The text of that act, afterwards embodied in Rev. Stat. §§ 2289 *et seq.,* makes it obvious that it was contemplated that as under the settled rule applied in the enforcement of the preëmption laws the homesteader was not to be confined to a particular regular quarter-section tract in order that he might receive 160 acres, but was authorized to make up the allotted quantity by joining contiguous legal subdivisions.

This is further illustrated by the text of § 2306, Rev. Stat., which provides that every person entitled to enter a soldier's and sailor's homestead, who had previously entered, under the

homestead laws, a quantity of land less than one hundred and
sixty acres, was authorized "to enter so much land as, when
added to the quantity previously entered, should not exceed
one hundred and sixty acres."

It was not until May 14, 1880 (c. 89, 21 Stat. 141), that a
homestead entry was permitted to be made upon unsurveyed
public land. The statute which operated this important change
moreover modified the homestead law in an important particu-
lar. Thus, for the first time, both as to the surveyed and un-
surveyed public lands, the right of the homestead settler was
allowed to be initiated by and to arise from the act of settle-
ment, and not from the record of the claim made in the Land
Office. These results arose from § 3 of the act, reading as fol-
lows:

"SEC. 3. That any settler who has settled, or who shall here-
after settle, on any of the public lands of the United States,
whether surveyed or unsurveyed, with the intention of claiming
the same under the homestead laws, shall be allowed the same
time to file his homestead application and perfect his original
entry in the United States land office as is now allowed to set-
tlers under the preemption laws to put their claims on record,
and his right shall relate back to the date of settlement the same
as if he settled under the preëmption laws."

See *Maddox* v. *Burnham, supra*

It cannot be doubted that at the inception the Land Office
considered that under the homestead law a settler was entitled
to take his 160 acres not alone from a regular quarter-section,
but to make up, as was the case under the preëmption law,
the quantity allowed by law, by taking adjoining and contigu-
ous legal subdivisions, and that such has continued to be the
rule by which the statute has been enforced to this time, both
as respects settlements upon unsurveyed as well as surveyed
lands. See circular October 30, 1862 (2 Lester, p. 248); depart-
mental instructions as to entries on public lands, contained in
bound volumes published in 1899 and 1904; circular August 4,
1906, 35 L. D. pp. 187–200.

Both under the preëmption law and under the homestead law, after the act of 1880, the rights of the settler were initiated by settlement. In general terms it may be said that the preemption laws (Rev. Stat. §§ 2257–2288), as a condition to an entry of public lands, merely required that the appropriation should have been for the exclusive use of the settler, that he should erect a dwelling house on the land, reside upon the tract, and improve the same. By the homestead law residence upon and cultivation of the land was required. Under neither law was there a specific requirement as to when the improvement of the land should be commenced or as to the nature and extent of such improvement, nor was there any requirement that the land selected should be inclosed.

As under both the preëmption and homestead laws, whether the settlement was made upon surveyed or unsurveyed land, the law did not make it necessary to file or record a claim in respect to the land until a considerable period of time had elapsed after the initiation of the right by settlement, it necessarily came to pass that controversies arose, from rights asserted by others to land upon which a settlement had been made, but as to which no exact specification appeared upon the records of the Land Office of the location and extent of the land claimed. In the administration of the land laws, in the endeavor to protect the rights of third parties acting in good faith, and at the same time to give effect to the rights arising from a settlement and the relation back of the claim when filed to its initiation by settlement, the decisions of the Land Office, while consistent in the interpretation of the statutes, perhaps present, from the nature of the subject, some lack of precision in the appreciation of the facts involved in particular cases. It is certain, however, that, viewing comprehensively the rulings of the Land Department, the subject has been considered in two aspects— first, the sufficiency of acts done by a settler upon or after initiating a claim to give notice of the extent of his claim to another settler; and, second, the sufficiency of like acts to entitle to a patent for the land as against the Government. In both

of the classes it is undoubted that the administrative rule has been, as to surveyed and unsurveyed lands, that the notice effected solely by improvements upon the land is confined to land within the particular quarter-section on which the improvements are situated. 5 L. D. 141. And this ruling was predicated upon the assumed import of the decision in *Quinby* v. *Conlan,* 104 U. S. 420.

In the first class of cases, however, that is, in contests between settlers, where the claim of the first settler embraced not only land within the legal subdivision on which the improvements had been placed, but contiguous land lying in another quarter-section, the ruling has ever been that any conduct of the first settler adequate to convey actual or constructive notice to a subsequent settler that the claim had been initiated not only to the land upon which the improvements were situated but as to contiguous land, even though in another quarter-section, sufficed to preserve the rights of the first settler. The scope of the rulings on this subject is illustrated by a decision of the Secretary of the Interior made in 1893, in *Sweet* v. *Doyle,* 17 L. D. 197. In that case the Secretary maintained the homestead right of Sweet to land lying in different sections. In doing so, reviewing previous decisions, attention was called to the fact that it had been ruled that the original settler might defeat an attempted settlement by another before the time when record notice was required, in any of the following modes: 1, as to a technical quarter-section by the settlement upon and placing of improvements thereon; 2, as to all of a tract, although lying in different quarter-sections, by improvements on each subdivision of the land outside of the quarter-section on which he had settled; 3, by actual notice to an intruder of the extent of the settlement claim. Two cases decided in 1887 (*Brown* v. *Central Pacific R. R. Co.,* 6 L. D. 151, and *Union Pacific R. R. Co.* v. *Simmons,* 6 L. D. 172) illustrate the recognition by the Land Department of a right in a qualified preëmptor to settle upon unsurveyed land, although lying in more than one quarter-section.

As to the second aspect, that is, the nature and character of the acts of the settler essential to initiate and preserve a claim to land as against the Government, the rulings of the Land Department have been liberal towards the settler, and his good faith and honest purpose to comply with the demands of the statute have primarily been considered, thus carrying out the injunction of this court in *Tarpey* v. *Madsen,* 178 U. S. 220, and cases there cited, to the effect that regard should be had in passing on the rights of settlers to the fact that "the law deals tenderly with one who, in good faith, goes upon the public lands with the view of making a home thereon." The general course of the Land Department on the subject is illustrated by two decisions; *Findley* v. *Ford,* 11 L. D. 173, and *Holman* v. *Hickerson,* 17 L D. 200.

As a result of this review of the legislation concerning pre-emptions and homesteads and of the settled interpretation continuously given to the same, we think there is no merit in the proposition that a homesteader who initiates a right as to either surveyed or unsurveyed land, and complies with the legal regulations, may not, when he enters the land, embrace in his claim land in contiguous quarter-sections, if he does not exceed the quantity allowed by law, and provided that his improvements are upon some portion of the tract and that he does such acts as put the public upon notice of the extent of his claim

Conclusive as is the text of the statutes and the long-continued administrative construction which has enforced them, it is nevertheless insisted that a contrary rule must be applied because of the decision in *Ferguson* v. *McLaughlin,* 96 U. S. 174. That case concerned a special act applicable alone to California, giving a right to preëmpt unsurveyed lands, and the special act governed the rights of the settler by the general rules controlling under the preëmption law of 1841, which, it is insisted, by the act of 1880 is made determinative of the right of a homesteader in respect to a settlement on unsurveyed land. The argument rests upon a misconception of the effect

of the decision in the cited case, or in any event assumes that expressions found in the opinion must be now held to govern a question not arising on the record in that case.

Without going into great detail, the material facts of the case, as shown by the file record and the statement of facts contained in the opinion, were these: Two persons settled on two distinct and separate but contiguous parcels of unsurveyed public land. Ferguson bought the rights of both these parties. On one of the tracts there was a dwelling and other valuable improvements, and Ferguson resided on that tract and cultivated and pastured both tracts. In March, 1866, by virtue of an act of the legislature of California, extending the limits of the town of Santa Clara, the parcel upon which was situated the residence of Ferguson, the possessory right to which had been acquired by him, came to be included within the limits of the town of Santa Clara. By a plat of the United States survey, filed on May 19, 1866, it was shown that the tract, the possessory right to which had been acquired by Ferguson, and which was outside of the corporation limits of the town referred to, lay in township 6. Thereafter Ferguson filed his declaratory statement, claiming the right to enter this parcel under the preemption laws. Subsequently, in October, 1866, the United States plat of survey of township 7, which embraced the town of Santa Clara, and therefore the residence tract of Ferguson, was filed. Ferguson then sought to amend his former declaratory statement so as to embrace the parcel of land situated in the town of Santa Clara, in township 7, upon which his residence and other improvements stood. The register and receiver, however, refused to allow this to be done, and required Ferguson to make a separate declaratory statement for that parcel. Subsequently, in virtue of a provision of an act of Congress, Ferguson, as the possessor of the lot and improvements referred to as situated in township 7, became the owner of that parcel by deed from the town. A contest ensued in the Land Office between Ferguson and a railway company claiming by statutory grant, which contest related solely to a portion

of the land in township 6 and upon which he filed his first de-
claratory statement. No controversy was had as to the land
included in the second declaratory statement, which related
to the land in the town of Santa Clara, because Ferguson had
acquired that land from the town in conformity to the act of
Congress. The local land officers decided that Ferguson was
not entitled to the land in township 6, which he claimed as a
preëmptor, "upon the sole and exclusive ground" that his
dwelling was not upon the land so claimed. This action was
affirmed by the Commissioner of the General Land Office and
the Secretary of the Interior, it being further found that by
reason of sales of portions of the land after filing Ferguson
could not be regarded as a *bona fide* settler. A patent issued to
the railway company for the land which it claimed, and a
transferee of the company brought ejectment against Fergu-
son in a state court of California to obtain possession of the
land, and Ferguson, under the practice in California, by way of
cross complaint, challenged the legal correctness of the ruling of
the Land Department, and asserted that the railroad and its
transferee held the land as his trustee. The trial court, as did
the Supreme Court of California, sustained the correctness of
the ruling of the Land Department, and the case came to this
court. Here the action of the court below was affirmed, the
court, in its opinion, declaring that the ruling of the Land
Department, rejecting the claim because the residence of Fergu-
son was not on any part of the Congressional subdivision "to
which the land belonged," was not only correct, but was also
an expression of the well-established rule of the Land Depart-
ment. True it is that in the course of the opinion expressions
were used which permit of the construction that it was intended
to be decided that a homestead settler could only acquire land
within a regular quarter-section, on which must be his improve-
ments. But the decision must be confined to the question be-
fore the court, which was the right of a settler to claim a tract
of 160 acres of land under the homestead law, when on no part
of the land for which the patent was claimed had the improve-

ments required by the statute been made. Not only the issues
in the case make this clear, but this also results from the state-
ment of the court, that its conclusion was in accord with and
was intended to uphold and apply the rulings of the Land De-
partment from the beginning. This must follow, because if
the language of the opinion relied upon in the argument were to
be given the meaning now attributed to it it would result that
the opinion, instead of giving sanction to and maintaining the
rulings of the Land Department, would have overthrown the
entire administrative construction of the act enforced from
the beginning. For whilst it is true, as has been shown, that
the Land Department had always held that there must be com-
pliance with the statutory requirements as to a dwelling and
improvements on the tract settled upon and claimed, those
rulings went *pari passu* with the consistent and settled rule by
which a settler was allowed to take the land which he claimed
from different quarter-sections if he had given adequate notice
of the extent of his claim both within and without the legal
subdivision in which his improvements were situated. And
this view of the true meaning of the decision in the *Ferguson
case*, irrespective of general expressions found in the opinion,
is fortified by the fact that, since that case was decided, in not
one of the rulings of the Land Department has the case been
referred to as changing the settled rule then prevailing, and
which has been continued without interruption. Indeed, when
the settled construction of the Land Department is taken into
view and the unbroken application of that rule by it is borne
in mind, the conclusion necessarily follows that Congress in
enacting the act of 1880 clearly must have had in mind the set-
tled rule of the Land Department which the *Ferguson case* de-
clared the court affirmed.

If we could bring ourselves to disregard the settled adminis-
trative construction prevailing for so many years, impliedly,
if not expressly, recognized by Congress, and should look at
the subject as an original question, it cannot be doubted that
even upon the hypothesis that statements in the opinion in

*Ferguson* v. *McLaughlin* justify the assumption now based upon them, such assumption would cause the decision in that case, if applied to the issue here presented, to be destructive of the rights of settlers to initiate claims, both as to surveyed and unsurveyed land, prior to the time of making formal application to enter the land. This is said, because it is apparent that the right given by the statute would be destroyed if it be that a homesteader who settles upon surveyed land, and locates his residence in an eligible situation upon a quarter-quarter-section, relying upon fertile land, in other quarter-sections to enable him to make his settlement fruitful, can, after having given public manifestation of his intention as to the boundaries of his claim, have all the land, except only the quarter-quarter-section on which he resides, taken away from him by some one else before the time arrives when by law the homesteader is required to make application to enter. And the same thing is more cogently true of unsurveyed land. No more apt illustration of the unjust result referred to could be given than is disclosed by this very case, for as we have said, the claim of Hickey embraced among other land two lots forming a fractional quarter-section. This was occasioned by the existence of a body of water which controlled the survey and caused the fractional quarter-section, consisting solely of the two lots referred to. It was upon this quarter-section, bordering upon the water, that Hickey erected his dwelling. It is apparent that the right given by statute would be unavailing if it were to be held that Hickey had not the legal power to initiate any claim to the contiguous land, thus confining him to the fractional lots bounded by the water, in effect cutting off the only land which could possibly have made the settlement beneficial, although immediately on such settlement, as found by the Land Department, Hickey had manifested to the whole community his purpose to claim the land which he afterwards applied to enter, in order to make up his 160 acres.

Concluding from the foregoing that the Land Department was right in its original decision as to the right of Hickey to

enter the land as a homestead, we are brought to consider the
second proposition, that is, whether the department was right
in rejecting the timber entry of Donohue and awarding the
land to the railroad company. When that question is considered in its ultimate aspect it will be apparent not only that it
is related to the question of the validity of the settlement of
Hickey, but it necessarily follows that the validity of that
settlement in effect demonstrates the error of law committed
by the department in its ruling as to the Donohue entry.

The decision of the Secretary of the Interior, which finally
sustained the application of Hickey, and directed that upon
the completion of the entry the selection of the railway company should be cancelled, was made on February 11, 1903.
Mrs. Hickey, as the heir of her son, completed the entry in June
following. About a month afterwards, however, she filed a
written relinquishment of the entry in the local land office, and
on the same day Donohue made a timber and stone application for the land and was allowed to enter the same. On report by the local land office of the relinquishment of Mrs.
Hickey, the General Land Office in February, 1904, accepted
the relinquishment and cancelled the homestead entry. At
the same time, however, the Commissioner instructed the local
land officers as follows:

"This releases from suspension the selection by the St. Paul,
Minneapolis and Manitoba Railway Company under act of
August 5, 1892, of lot 12, sec. 3, and lots 9 and 10, sec. 4—
lots 14 and 15 not appearing to be within the company's original
selection.

"You will inform Mrs. Hickey of the above action, and also
advise the company thereof, and that thirty days' preference
right will be allowed it in which to perfect its selection of said
lot 12, sec. 3, and lots 9 and 10, sec. 4, in accordance with its
Duluth list 7 (supplemental to list 5) filed July 22, 1896."

In March, 1904, the Commissioner, writing to the local land
officers in regard to a report by them of the allowance of Donohue's timber culture entry, said:

"This entry should not have been allowed; the contest for this land was between the railway company and the heirs of Jerry Hickey; but before the final action on the case, and the rejection of the company's application to select, the claim of the heirs of Hickey was relinquished and their homestead cancelled, which left the land subject to the application of the company.

"You will, therefore, notify the company in accordance with instructions of February 18, allowing it thirty days from notice in which to perfect its selection.

"The entry of Donohue will be held suspended, subject to the action of the company; and should it perfect the selection, the entry will be held for cancellation."

The railway company perfected its selection of the lands in controversy, and the "entry of Donohue was held for cancellation, subject to appeal." Donohue appealed; but in an opinion dated December 16, 1904, the action of the Commissioner was approved, and this decision was reaffirmed in an opinion dated March 17, 1905, ruling adversely upon a motion to review. The selection made by the railway company was approved by the Secretary of the Interior, and a patent was issued for the land.

The Secretary of the Interior, in ruling upon the effect of the relinquishment of Mrs. Hickey and in passing upon the claim of Donohue proceeded upon the hypothesis that the controversy presented by the appeal of Donohue was really a prolongation or extension of the original contest, and that the relinquishment of Mrs. Hickey constituted an abandonment of the homestead application, and, being made during the contest, conclusively established that the settlement of Hickey was not made in "good faith," and that such relinquishment operated to make the settlement of Hickey inefficacious to initiate a claim to the land, thereby validating the selection made by the railway company.

But the assumptions upon which these conclusions were based clearly disregarded the fact of the long possession by Hickey and his heir of the land during the pendency of the

contest and disregarded the previous and final ruling of the Secretary, made in February, 1903, which maintained the validity of the settlement of Hickey and decided that by such settlement he had validly initiated a claim to the land. When this is borne in mind it is clear that the ruling rejecting the Donohue claim and maintaining the selection of the railway company was erroneous as a matter of law, since by the terms of the act of August 5, 1892, c. 382, 27 Stat. 390, the railway company was confined in its selection of indemnity lands to lands non-mineral and not reserved, "and to which no adverse right or claim shall have attached or have been initiated at the time of the making of such selection. . . ." When the selection and supplementary selection of the railway company was made the land was segregated from the public domain and was not subject to entry by the railroad company. *Hastings & Dakota Ry. Co.* v. *Whitney,* 132 U. S. 357; *Whitney* v. *Taylor,* 158 U. S. 85; *Oregon & California R. R. Co.* v. *United States,* 190 U. S. 186.

Further, the decision refusing recognition to the Donohue entry, and awarding the land to the railway company, disregarded the statutory right of Mrs. Hickey to relinquish and of Donohue to make application for the land conferred by the first section of the act of May 14, 1880, c. 89, 21 Stat. 140, reading as follows:

". . . when a preëmption, homestead, or timber-culture claimant shall file a written relinquishment of his claim in the local land office, the land covered by such claim shall be held as open to settlement and entry without further action on the part of the Commissioner of the General Land Office."

*Affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE BREWER and MR. JUSTICE MOODY dissent.