McNARY LUMBER CO., Limited, v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. June 22, 1925.)

No. 4439.

1. Public lands ⬡➾80—Purchaser must ascertain boundaries of settler's claim.

Under Act Feb. 8, 1887, confirming railroad land grant, and excepting land occupied by actual settlers, as homestead claim was not limited to quarter section on which improvements were made, it was incumbent on those who purchased land to ascertain boundaries of settler's claim.

2. Public lands ⬡➾35(1)—Settler may embrace in claim land in contiguous quarter sections.

Settler of land, having improved southeast quarter of northwest quarter, could embrace in his claim northwest quarter of northwest quarter, since it was in same quarter section.

3. Public lands ⬡➾80—Evidence held to sustain homestead entry.

Evidence held insufficient to impeach action of Land Department in sustaining homestead entry as against railroad land grant, under Act Feb. 8, 1887.

Appeal from the District Court of the United States for the Western District of Louisiana; Rufus E. Foster, Judge.

Suit by the United States against the McNary Lumber Company, Limited. Decree for the United States, and defendant appeals. Affirmed.

John H. Overton, of Alexandria, La. (Blackman & Overton, of Alexandria, La., on the brief), for appellant.

Philip H. Mecom, U. S. Atty., of Shreveport, La., and Robert A. Hunter, Sp. Asst. Atty. Gen., for the United States.

Before WALKER and BRYAN, Circuit Judges, and HUTCHESON, District Judge.

BRYAN, Circuit Judge. This is an appeal from a decree declaring that appellant held the legal title to 80 acres of land in trust for the heirs of a homestead claimant, and requiring appellant to convey such title to them, and to pay to the United States, appellee, for their benefit $3,000, the agreed value of the timber which it had cut and removed from the land. The land involved is the northeast quarter of the northwest quarter and the northwest quarter of the northeast quarter of section 29, township 1 north, of range 2 west, Louisiana meridian. On December 28, 1892, it was patented to the New Orleans Pacific Railway Company, under the Act of February 8, 1887 (24 Stat. 391), and on March 18, 1894, was conveyed by the railway company to James D. Lacey, and passed by mesne conveyances to appellant on January 2, 1913.

On January 26, 1900, John W. Pitman made application to enter under the homestead law the 80 acres above described, and also an additional 80 acres contained in the southeast quarter of the northwest quarter and the southwest quarter of the northwest quarter of the same section. That application was opposed by the railway company, but it does not appear that the then holder of the title under the patent had notice or made any contest. At the hearing which ensued before the local land office, the testimony of Pitman and two settlers, who lived in the neighborhood where the land is situated, was to the effect that Mrs. Mary Ashmore settled upon the southeast quarter of the northwest quarter of the section in 1880, built a dwelling upon it, and had at least 10 acres in cultivation and under fence, and that she or her assigns lived there continuously until 1889, at which time Pitman acquired the claim; that Pitman continued to live upon this 40-acre tract, and was living there at the time of his application; and that the homestead claim of Mrs. Ashmore and assigns included, not only the 40 acres upon which the improvements had been placed, but also the land involved in this suit and the southwest quarter of the northeast quarter. It was further shown that each of the persons who from time to time lived upon the land was qualified to make a homestead entry. Upon this evidence, the register and receiver of the local land office decided in favor of Pitman, the homestead claimant, and their decision was approved in 1901 by the Commissioner of the General Land Office.

At the hearing before the master in the present suit, John T. Ashmore, son of the

original settler, was permitted to testify, over appellee's objection, that his mother did not claim the 80 acres in dispute, but instead claimed the west half of the southeast quarter of the section. In this connection he testified as indicated below, the questions being propounded by the master:

"Q. What makes you so clear that it was three 40's east and west and one 40 north, outside of that plat, that was intended to be homesteaded by your mother? Why are you so positive that it was your mother's intention to homestead three 40's east and west and this one 40 north? A. Well, that is the way; it was laid out that way. I got Mr. Nash, taken him over there; he owned land there. I got him to come over there, and he had an idea, I don't know if he ever had it surveyed, he had an idea his line was here, and I am sure this was the land.

"Q. You don't know if anybody claimed this land up here? A. No, sir.

"Q. Mr. Nash made a survey of the east half of the southwest quarter? A. Yes, sir.

"Q. And you wanted the two 40's next to the house? A. East of his.

"Q. And that would be the west half of the southeast? A. Yes, sir.

"Q. And those you and your mother claimed? A. Yes, sir.

"Q. And the next two 40's were transferred to the Pitmans? A. Yes, sir.

"Q. Who is Mr. Nash? Is he living? A. No, sir. He lived across the creek from me at that time."

That witness further testified that he did not think Mr. Nash's house was on the same section as his mother's, and said: "It was over there somewhere, on the west side of Spring creek, and this is on the east side."

The rights of settlers under the land grant to the New Orleans Pacific Railway Company are fully set forth in United States v. New Orleans Pac. R. Co., 248 U. S. 507, 39 S. Ct. 175, 63 L. Ed. 388. In that case it was held that persons qualified and claiming under the homestead law, who settled on portions of sections within the grant before the definite location of the railroad, and who thereafter maintained their claims by residence, occupation, and cultivation, were excepted from the grant to the railway company, and were entitled to make entry under the public land laws; that November 17, 1882, was the date of the definite location of the railroad; that the provisions of sections 2 and 6 became applicable to all lands which the railway company had not sold prior to the passage of the act and acceptance of its terms, and that intending purchasers were bound to take notice of the occupancy of settlers; and that those who hold title under patents to the railway company are not to be considered as bona fide purchasers. The railway company accepted the provisions of the land grant act in April, 1887, long before it sold the land in dispute.

[1] We are of opinion that the decision of the Supreme Court in the case cited answers every objection urged by appellant to the decree in this case. In that case, as in this, the claimant was not in actual possession of the entire tract, but had only improved and cultivated a few acres. In view of the fact that a homestead claimant is not limited to the quarter section on which improvements are made, it is incumbent upon those who purchase lands to ascertain the boundaries of the settler's claim.

[2] In this case the improvements were on the southeast quarter of the northwest quarter, and were sufficient in and of themselves to entitle the settler to claim the northeast quarter of the northwest quarter, because it was in the same quarter section. St. Paul, etc., Ry. Co. v. Donohue, 210 U. S. 21, 32, 28 S. Ct. 600, 52 L. Ed. 941. If there had been no testimony as to the extent of the claim of the original settler and her assigns, the utmost that appellant would be entitled to contend for would be the 40 acres described as the northwest quarter of the northeast quarter.

[3] Assuming that the testimony of John T. Ashmore, to the effect that his mother claimed other land situated in the southeast quarter of the section, was admissible, manifestly it was not clear, definite, and consistent as to what land was embraced in the homestead claim of the original settler. The record is consistent with the conclusion that that testimony was so lacking in probative value as to justify the court's refusal to make or sustain a finding based on it. The fact that Pitman included the land in dispute in his homestead claim and swore that Mary Ashmore, the original settler, sold to Pitman's predecessor in possession and claim her claim and possessory rights to the tract which included the land in dispute, is some evidence that the claim of the original settler included that land, and this evidence was strengthened by testimony of witnesses who lived in the neighborhood from the date of the original settlement until the homestead application was made.

The record does not require the conclusion that the testimony relied on in behalf of appellant was enough to impeach the action of the Land Department in sustaining Pitman's

claim. The first question asked Ashmore by the master assumed that three of the 40-acre tracts extended east and west, which is erroneous under any view; but Ashmore accepted it as including a correct description of the land claimed by his mother. He first stated that he did not know whether the land claimed by Nash ever had been surveyed, but testified almost immediately afterwards, in answer to a leading question, that Nash made a survey of the east half of the southeast quarter. There was evidence enough, if believed by the officers of the Land Department, to sustain the homestead entry.

The decree of the District Court is affirmed.