UNITED STATES v. CENTRAL PAC. R. CO. et al.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1899.)

No. 481.

PUBLIC LANDS—RAILROAD GRANT—PRE-EMPTION CLAIMS.

A pre-emption settler on unsurveyed public lands, who, at the time a railroad grant attached by the definite location of the line of road, had in no way indicated the boundaries of his claim, cannot, by thereafter extending his improvements over a tract which he had not at that time claimed or improved, and which by the subsequent survey was shown to be within a section granted to the railroad company, acquire any claim or rights thereto as against the railroad company.

Appeal from the Circuit Court of the United States for the Northern District of California.

Marshall B. Woodworth (H. S. Foote, of counsel), Asst. U. S. Atty. W. Singer, Jr. (Wm. F. Herrin, of counsel), for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This suit is brought to cancel a patent issued to the defendant the Central Pacific Railroad Company, as the successor in ownership to the California & Oregon Railroad Company, on January 24, 1880, to the E. ½ of N. E. ¼ of section 33, township 22 N., range 4 E., M. D. M., on the ground that it was issued "through mistake, inadvertence, and error." The land in controversy is within the land grant made to the California & Oregon Railroad Company under the act of congress of July 25, 1866 (14 Stat. 239). This act granted to the railroad company 10 odd sections of land on each side of the railroad line, not "granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of." The map of the definite location of the road was filed in the office of

the secretary of the interior September 13, 1867, and on October 29, 1867, the lands lying within the limits of the grant were withdrawn from sale by the commissioner of the general land office. The question presented is whether one Michael Lannon had acquired a right of pre-emption to the land prior to September 13, 1867, when the line of the railroad was definitely fixed and located.

It appears from the testimony that in 1858 the said Michael Lannon, being then an alien, and engaged in the business of mining near the land in controversy, settled upon the W. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of section 34, township 22 N., of range 4 E. This and the land in controversy were adjoining subdivisions of the then public, unsurveyed land, containing 80 acres each. The land was surveyed in September and October, 1878, and the official plat of this survey was filed in the land office December 14, 1878. Lannon on February 11, 1867, qualified himself to make a pre-emption claim by filing his intention to become a citizen of the United States. In 1869 Lannon cleared the land in controversy, in 1870 he cultivated a portion of the land, and in 1871 he built a house and moved upon the land. Prior to that time he lived in his house on section 34, upon the 80 acres of land which is not in controversy in this suit. On May 21, 1879, Lannon filed his declaratory statement with the register of the land office at Marysville, Cal., upon the 80 acres of land in section 34; and on December 20, 1879, he filed an application to amend his pre-emption declaratory statement so as to include the 80 acres in controversy, which was allowed by the acting commissioner of the land office.

We are of opinion that Lannon was not, at the date the railroad's grant attached, to wit, September 13, 1867, entitled to pre-empt the land in controversy. He was not a pre-emption settler upon the land, within the provisions of section 2259, Rev. St., which declare that:

"Every person * * * who has made, or hereafter makes, a settlement in person on the public lands subject to pre-emption, and who inhabits and improves the same, and who has erected or shall erect a dwelling thereon, is authorized to enter with the register of the land office for the district in which such land lies, by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter section of land, to include the residence of such claimant."

There is no testimony in the record which shows that prior to September 13, 1867, when the map of the definite location of the railroad was filed, the said Lannon had ever entered upon the land in controversy, or claimed or intended to claim the same, or made any improvements thereon of any kind, or exercised any act of dominion or control over it in any manner whatsoever. The ground floor, upon which the entire superstructure of appellant's argument is built, is based upon the proposition "that Lannon intended to and did claim to have settled upon, cultivated, and improved 160 acres from the time of his original settlement to the date of his official survey in 1878," and that the land in controversy was embraced in said claim, and it is contended that these facts are "established by the evidence beyond contradiction." The testimony upon which appellant chiefly relies is, as stated by counsel, "best described in Lannon's own simple style." In his direct examination, Lannon testified as follows:

"Q. What was your object in settling here and building a house? A. My object was to make a home, if I lived to be old. Q. Did you know how much land you were entitled to as a pre-emptor or a homesteader? A. I did, but I never had any way to file on it until the government survey was made. * * * Q. You did know how much you was entitled to? A. Yes. Q. Did you at any time prior to May, 1871, indicate in any way— How much land did you understand you were entitled to? A. I understood I was entitled to 160 acres of land,—of government land from the government. Q. Did you, prior to May, 1862, in any way and in what manner, indicate what particular 160 acres of land you intended to make your home? A. Yes; that land that suited me, that was suitable for a man to take, that could be cultivated. Q. The question is, did you indicate it, and, if so, by what means; that is, did you fence it round, run furrows around it, or stake it, or blaze it, or anything of that kind? A. No, sir; there was nothing in that part of the country staked out or blazed out by any settler until the government survey was made. Q. Did you assert ownership or claim to any particular 160 acres? A. Yes. Q. What was it? A. Just this same land now that I live on.—that I made my improvements on. That is the same land. * * * Q. What did you mean by making affidavit that you moved on it in 1858? A. There was no odd section and no even sections there then. I claimed 160 acres of government land whenever it came on the market. When the north and south line was run, it cut my improvements in two, like that, and threw all my buildings and orchard and vineyard upon this odd section. · Q. What 160 acres of land did you claim, sir? A. I could not say what 160 acres it was. There was no sections. How could a man claim any 40 or 80? How could he name it?"

It will be noticed that this testimony is in many respects uncertain and indefinite. The effect of his testimony is made more specific upon his cross-examination, as follows:

"Q. You moved on this land in 1870, didn't you, Mr. Lannon,—this particular piece of land in controversy? I think you stated that you cleared it in 1869 and 1870, and moved on and built your house in 1871. A. Exactly; moved and got a crop of hay in June, 1871. Q. You were on the land before 1869, were you not? A. I was not living on it, but I had labor done,—cleared and cropped. Q. In 1869? A. In 1870. Q. Had you done anything on this land before 1869? You had not done anything, had you, on the land before 1869? A. Nothing more than cutting brush. Q. What year did you do that first? A. In 1869 and '70. Q. Then in 1868 you had not cut any brush or cleared the land at all, had you? A. No, sir. * * * Q. When was it that you first went on this particular piece of land? In what year was it,—1868, 1869, or 1870? A. 1871,—1870 and 1871. * * * Q. You have repeatedly stated that you did not settle on this land because it was not surveyed. Now, without regard to the survey, without describing it by the survey, what 160 acres did you claim around and about your house there,—the cabin,—the first house you put up? A. The portion of land that I wanted was where I put in a crop; that could be cultivated; all cleared and cropped. That was the land that I intended to claim, if it ever came on the market, and that is the land I improved. Q. You intended to; but did you claim, or did you simply intend to claim, it? A. I intended, when it came on the market, that I would claim it. Q. The question is, did you claim it from the time you settled there, or did you simply intend to do it? A. Yes. Q. Which? A. Did you intend to, or did you, claim it? Did you claim it always? Did your neighbors know what particular 160 acres you claimed there? A. They did not know. Q. I do not mean by description, but did they know the particular tract of land you claimed, without regard to the description of it by survey? A. They did not. Q. Couldn't you have gone and pointed out the lands independent of any survey? A. I could not, because the miners were scattered back and forth in these ravines. I have always claimed 160 acres. Q. What 160 acres? A. This same land I made my improvements on."

If Lannon had indicated by act or deed his intention prior to September 13, 1867, to claim the land in controversy as a part of the land he had located upon in 1858, then his improvements and dwell-

ing on the 80 acres where he first resided might have been sufficient to enable him to maintain his claim thereto, unless the legal questions discussed by counsel would deprive him of that right. But in the absence of any such indication until after September 13, 1867, we think the facts are wholly insufficient. Lannon gained no additional rights by his entry, settlement, and residence upon the land in controversy after September 13, 1867. We are of opinion that the action of the circuit court in refusing to cancel the patent upon this ground was correct.

It is evident from the testimony quoted that Lannon is an illiterate man, and it is argued that allowance ought to be made upon that ground in considering his testimony. The courts have always been liberal in their construction in favor of the rights of settlers upon the public land, but ignorance of the law, or failure to comply with it, cannot be considered in the acquisition of a right created by statute, where the statutory requirements have not been complied with. As was said in Maddox v. Burnham, 156 U. S. 544, 547, 15 Sup. Ct. 449:

"It cannot be that when he fails, even by reason of his poverty, to do that which the law prescribed as the initiation of any rights in the land, he is nevertheless entitled to the same protection which he would receive had he complied with the statute. Leniently as the conduct of a settler is always regarded by the courts, it cannot be that such leniency will tolerate the omission by him of any of the substantial requirements of the statute in respect to the creation of rights in the public lands."

The decree of the circuit court is affirmed.