## SOUTHERN PAC. CO. et al. v. CITY OF RENO.

### (District Court, D. Nevada. April 4, 1919.)

### No. A-52.

1. DEDICATION ⊜⊸58—CHANGE OF USE.
    A dedication of land to the public for one purpose does not necessarily justify its use for another purpose.
2. PUBLIC LANDS ⊜⊸92—RAILROAD RIGHT OF WAY—EFFECT OF GRANT.
    Land granted by Act July 1, 1862, for a railroad right of way, was dedicated by the government to a use deemed essential to national prosperity and safety, and could not thereafter be alienated or dedicated for any other kind of use, public or private, without the consent of Congress.
3. PUBLIC LANDS ⊜⊸92—RAILROAD RIGHT OF WAY—PRIORITY OF GRANT.
    The grant of lands for a railroad right of way by Act July 1, 1862, § 2, was a present grant, floating until the route was definitely fixed, but then sufficient to cut off all claims to lands thereby granted which were initiated subsequent to the date of the act.
4. PUBLIC LANDS ⊜⊸92—GRANT OF RAILROAD RIGHT OF WAY—FAILURE TO FILE MAP.
    The failure of the railroad company to file the map of its located route, as required by Act July 1, 1862, § 7, to supply information on which lands could be withdrawn upon entry, does not affect the title of the railroad to the right of way granted by section 2 of the act.
5. PUBLIC LANDS ⊜⊸92—RAILROAD RIGHT OF WAY—AMENDATORY ACTS.
    Act July 2, 1864, § 16, authorizing the Central Pacific Railway Company to extend its line 150 miles east of the California line, and Act July 3, 1866, § 2, authorizing extension of line with approval of the Secretary of the Interior until it met the Union Pacific, were amendatory of Act July 1, 1862, passed under the power reserved by section 18 of the latter act, and were not intended to forfeit the rights of way granted by section 2 of the act of 1862, and the right of the railroad to the right of way over lands within the limits of construction by the act of 1864 dates from 1862, and not from 1866.
6. PUBLIC LANDS ⊜⊸92—RAILROAD RIGHT OF WAY—EXCEPTIONS.
    The railroad right of way granted by Act July 1, 1862, § 2, over public lands, was not impliedly subject to the exception in the grant by section 3 of that act of alternate sections, exempting from the grant lands to which a pre-emption or homestead claim had attached at the time the road was definitely located.
7. PUBLIC LANDS ⊜⊸92—RAILROAD RIGHT OF WAY—LANDS AFFECTED.
    Within Act July 1, 1862, § 2, granting a railroad right of way over public lands, the term "public lands" means such lands belonging to the government as are subject to sale or other disposal under general laws.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Land.]
8. PUBLIC LANDS ⊜⊸92—RAILROAD RIGHT OF WAY—PRE-EMPTION—ENTRY—RETROACTIVE EFFECT.
    A pre-emption entry, made in the land office two years after the adoption of Act July 1, 1862, § 2, granting a railroad right of way over public lands, could not in itself have a retroactive effect sufficient to overcome the grant of the right of way.
9. PUBLIC LANDS ⊜⊸114(3)—RAILROAD RIGHT OF WAY—EXCEPTION FROM PATENTS.
    The failure of the land office to include, in a patent to land over which a right of way had been previously granted to a railroad, an express reservation of the easement, does not impair the easement.

⊜⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. PUBLIC LANDS ☞41—PRE-EMPTION—PRIORITY—BURDEN OF PROOF.

Where a congressional grant of railroad right of way antedated a patent two years, the burden is on the patentee, claiming an equity prior to the easement, to establish the equity by competent evidence.

11. PUBLIC LANDS ☞41—PRE-EMPTION—DECLARATORY STATEMENT—CONTRADICTION.

Recitals of fact in the declaratory statement of a pre-emption claimant, as against one claiming under a title adverse to the pre-emption, procured by another and a different course of procedure, are no more than ex parte statements by an interested party, which the other is not estopped from contradicting by competent evidence.

12. PUBLIC LANDS ☞34—PRE-EMPTION—DECLARATORY STATEMENT—RIGHTS ACQUIRED.

Declaratory statement, filed under the pre-emption law (Rev. St. §§ 2264, 2265), sets apart the land to the pre-emptioner's option to purchase, and severs such land from the mass of public land until the entry is canceled or forfeited.

13. PUBLIC LANDS ☞34—PRE-EMPTION—UNSURVEYED LAND—EXTENT OF CLAIM.

Under the pre-emption law (Rev. St. §§ 2264, 2265), a settlement on unsurveyed land does not entitle the pre-emptioner to a floating right to claim after survey any land within the three-quarter mile radius from the 40 on which his house is located, but is confined to the quarter section or sections on which the settlement is made.

14. PUBLIC LANDS ☞92—PRE-EMPTION—NOTICE OF CLAIM—PRIORITY OF GRANT OF RIGHT OF WAY.

Where settlement was claimed on two contiguous quarter sections of unsurveyed land, on one of which the settler was residing and had placed all his improvements, his claim to a subdivision in the other quarter section, on which he had made no improvements, on which he had posted no notice that it was claimed by him, and as to which he had given no actual notice of his claim prior to his pre-emption entry in the land office in 1864, must yield to the right of way granted by the act of July 1, 1862, to the Central Pacific Railroad Company, even though the actual settlement antedated the act and the subdivision was patented to the settler in 1865.

15. PUBLIC LANDS ☞129—PATENTS—QUIETING TITLE—EVIDENCE.

In a suit against a city to quiet title to a tract of land claimed by a railroad under its right of way grant, for which the city had paid rental, and against which it had assessed improvement taxes, the city cannot object to oral evidence as to the settlement by the pre-emptioner, from whom it derived title, on the ground that too long a time had elapsed since the pre-emption patent was issued.

16. EVIDENCE ☞387(3)—ORAL EVIDENCE—CONTRADICTING LAND OFFICE RECORDS.

Oral evidence that the pre-emption settlement on which the patent through which defendant derived title was based was not made on the tract in question until after a grant of plaintiff's right of way by Congress will not be excluded on the ground that the land office records should control.

In Equity. Suit to quiet title by the Southern Pacific Company and another against the City of Reno. Decree entered for plaintiffs.

This is a suit to quiet title to a tract of land situated in the city of Reno, Nev., between Plaza street and the railroad tracks, and extending from Virginia street to Sierra street. It is 300 feet long by 92 feet wide, and within 200 feet from the center of plaintiffs' railroad tracks as originally placed With reference to the government surveys, it is in the S. W. ¼ of the N. E. ¼ of section 11, township 19 N., range 19 E. M. D. B. & M.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Ind x s

The railroad was constructed as contemplated by Act July 1, 1862 (12 Stat. 489, c. 120), and on the 8th day of June, 1868, that portion of it adjacent to the tract of land in dispute had been approved, and was finally accepted by the United States government. July 18, 1863, the government surveys covering the territory later occupied by the town site of Reno, were completed, and on the 1st day of March of the following year the official plat was filed in the United States land office at Carson, Nev. Two days later, March 3, 1864, Myron Lake filed in the same office a declaratory statement, in which he alleged that on April 22, 1861, he settled and improved the S. W. ¼ of the N. E. ¼, and lots 1, 2, 3, 4, and 8 of section 11, in township 19 N., range 19 E., and also declared his intention to claim the land as a pre-emption right under Act Sept. 4, 1841. A receiver's certificate was issued to him August 3, 1864, and a United States patent August 10, 1865. Prior to 1865 Lake had no improvements of any kind in the N. E. ¼ of section 11. His fences, buildings, and cultivation, with the exception of the north end of the bridge across the Truckee river, were all on the south side of that stream, and in the south half of the section.

In Book A of Surveys, page 93, in the recorder's office of Washoe county, appear the records, plat, and field notes of survey of a possessory claim filed for record February 3, 1863, and numbered 88. The survey shows Lake's improvements, and covers 203½ acres of land lying on both sides of the river. The north boundary line of the claim at all points is more than 200 feet south of plaintiffs' railroad, and still further south of the land in controversy. This survey purports to have been made for Myron Lake by the county surveyor. His certificate attached thereto complies with the provisions of an act of the territorial Legislature regulating surveyors and surveying, approved November 29, 1861 (Laws Nev. 1861, p. 267). By that statute the county surveyor was required to execute any survey upon application of any individual or corporation, to keep a correct record thereof, and to make a certificate of such survey describing the tract and the number of acres contained. The certificate, after the date of record, was evidence of possession for one year, and legal evidence in any court of the territory.

By deed dated March 27, 1868, Myron Lake conveyed the S. ½ of the N. E. ¼, and the fractional lots lying north of the Truckee river in the N. ½ of the S. E. ¼, all in section 11, to Charles Crocker. August 1, 1868, a map of the town of Reno was filed in the office of the county clerk of Washoe county. On this map the lands conveyed by Lake to Crocker were subdivided into lots and blocks, intersected by streets and alleys. One tract was left open and marked "Plaza." The parcel of land in controversy constitutes the west end of the Plaza. June 27, 1871, a second map of the town of Reno was filed in the office of the county recorder. This map differs from the first, in that the serial numbers of several blocks are changed. These are the only township maps of Reno in evidence.

From May 9, 1868, Crocker sold lots by reference to "the official map of said town." All his conveyances of real estate, situated within the territory covered by these maps, refer to no lots, blocks, or alleys, by number, letter, or name, which do not have a corresponding number, letter, or name on the township maps. The tract in controversy, since the first maps were filed, has remained open and uninclosed. According to the plats the main Plaza extends along the north side of the railroad track for a distance of four blocks, about 1,450 feet, and from Sierra street to Peavine street. The freight sheds, platforms, and warehouses in a continuous line extend along the south side of the tract and the north side of the railroad for a distance of more than 1,100 feet, and along the south side of the tract in controversy for more than two-thirds its length. The warehouses, three in number, are about 50 feet wide, and have an aggregate length of about 600 feet. Hereafter in this opinion the land in controversy will be termed the Plaza.

The Plaza was used in early days by teamsters hauling freight to and from the railroad, and from the warehouse of D. W. Earl & Co. It is in testimony that the teamsters also used this as a camping ground. Shows, public meetings, and carnivals were held there, and as early as 1873 the town authorities granted permits for the use of the tract by private individuals. In 1907,

by ordinance, the city provided that all open-air meetings should be held on the Plaza. The railroad company also granted and refused applications to use the ground. John Fulton, agent of the company at Reno from 1907 to 1912, testifies that the company, so far as he knew, took exclusive control of the Plaza, and used it for railroad purposes, such as spotting cars, unloading freight, and storing merchandise. He knew of no divided authority over the Plaza by the city and the company. From 1870 to 1899, the authorities at Reno maintained a fire house in the northeast corner of the tract, for which they paid a rental of $5 per year to the railroad company. In 1908 one-half the cost of paving the streets bounding the Plaza, amounting to $5,992.65, was assessed by the city to, and paid by, the railroad company. March 14, 1916, the authorities of Reno caused the Plaza to be plowed up for the purpose of parking and beautifying it as the property of the city. It is admitted that such a park will effectually prevent the railroad company from in any manner enjoying the use and possession of the tract.

Brown & Belford, of Reno, Nev., for plaintiffs.
Lester D. Summerfield, City Atty., of Reno, Nev., for defendant.

FARRINGTON, District Judge (after stating the facts as above). The city of Reno contends that Myron Lake's pre-emption claim attached to the land in controversy before the right of way grant was made, and that Charles Crocker, having acquired Lake's title, sold a large number of town lots in Reno during the years immediately following 1866, by reference to an official map or maps then on file in the offices of the county clerk or county recorder of Washoe county; that Crocker caused these maps to be made and filed; on them there is an open space, marked "Plaza," extending along the north side of the railroad company's tracks, freight platforms, sheds, and warehouses; and that this constituted a valid common-law dedication.

[1] No issue is raised as to whether plowing the tract and converting it into a park is consistent with or destructive of the public use for which the alleged dedication was originally designed. It is hardly possible that Crocker in this instance intended that the Plaza, or any part of it, should be converted into a park, and that the public should thus be shut off, wholly or partially, from access to the railroad, or that the open space, so convenient for receiving and delivering freight, should become a barrier against such activities. It is sufficient to say, in passing, that a dedication for one purpose does not necessarily justify use for another. Riverside v. Maclean, 210 Ill. 308, 71 N. E. 408, 66 L. R. A. 288, 102 Am. St. Rep. 164; Sachs v. Towanda, 79 Ill. App. 439; Hopkinsville v. Jarrett, 156 Ky. 777, 162 S. W. 85, 50 L. R. A. (N. S.) 465; Church v. Portland, 18 Or. 73, 22 Pac. 528, 6 L. R. A. 259; 7 Am. & Eng. Ency. L. 73.

[2] Plaintiffs contend that the Plaza never was private property, but that it is a part of the right of way granted by the government of the United States in an act entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same for postal, military and other purposes," approved July 1, 1862. 12 Stat. p. 489.

If this contention is meritorious, the Plaza, since the date of the act, could not in any manner, or for any kind of use, public or private, be alienated, dedicated, or otherwise disposed of without the consent and

approval of Congress, because it had already been dedicated by the government itself to a use then deemed essential to the national prosperity and safety.  The provision of the act granting the right of way is as follows:

"Sec. 2. And be it further enacted, that the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; * * * said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops and depots, machine shops, switches, side tracks, turntables, and water stations.  The United States shall extinguish as rapidly as may be the Indian titles to all lands falling under the operation of this act and required in said right of way and grants hereinafter made."

The provisions of section 3 of the act, which will be considered in construing section 2, are as follows:

"Sec. 3. And be it further enacted, that there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached, at the time the line of said road is definitely fixed."

Congress thus conclusively determined that a right of way 400 feet in width was essential to the performance of the public service and duties assumed by the railroad company.  Northern Pac. Ry. Co. v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044.

[3] The granting words used in section 2 are in the present tense, and import a present grant.  The right granted did not attach to any particular portion of the ground, however, until the route was definitely fixed.  In this respect the grant was floating; but, when the route was definitely fixed, the company's title was sufficient to cut off all claims initiated subsequent to the date of the act.  In other words, it was a grant in præsenti, and so the courts have uniformly held.  Furthermore, it is an absolute grant, subject to no conditions, except those necessarily implied, such as that the railroad shall be constructed and used for the purposes designed.

"The right of way for the whole distance of the proposed route was a very important part of the aid given.  If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road.  For any loss of lands by settlement or reservation, other lands are given; but for the loss of the right of way by these means no compensation is provided, nor could any be given by the substitution of another route.  The uncertainty as to the ultimate location of the line of the road is recognized throughout the act, and where any qualification is intended in the operation of the grant of lands, from this circumstance, it is designated.  Had a similar qualification upon the absolute grant of the right of way been intended, it can hardly be doubted that it would have been expressed.  The fact that none is expressed is conclusive that none exists."  Railroad Co. v. Baldwin, 103 U. S. 426, 429 (26 L. Ed. 578).

The original scheme of a transcontinental railroad contemplated a main stem to be built by the Union Pacific Railroad Company and the Central Pacific Railroad Company, the former to begin at a point in Nebraska about 200 miles west of Omaha on the 100th meridian, and to construct westward to meet the Central Pacific. The original act of July 1, 1862 (section 9), authorized the Central Pacific—

"to construct a railroad * * * from the Pacific Coast, at or near San Francisco, or the navigable waters of the Sacramento river, to the eastern boundary of California."

The next section (10) contains the following provision:

"The Central Pacific Railroad Company of California, after completing its road across said state, is authorized to continue the construction of said railroad * * * through the territories of the United States to the Missouri river, * * * on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect."

In the amendatory act of July 2, 1864 (13 Stat. 356, c. 216), section 16 provides that:

"Should the Central Pacific Railroad Company of California complete their line to the eastern line of the state of California, before the line of the Union Pacific Railroad Company shall have been extended westward so as to meet the line of said first-named company, said first-named company may extend their line of road eastward one hundred and fifty miles on the established route, so as to meet and connect with the line of the Union Pacific road, complying in all respects with the provisions and restrictions of this act as to said Union Pacific road."

Section 2 of the act of July 3, 1866 (14 Stat. 79, c. 159), contains the following provision:

"The Union Pacific Railroad Company, with the consent and approval of the Secretary of the Interior, are hereby authorized to locate, construct, and continue their road from Omaha, in Nebraska Territory, westward, according to the best and most practicable route, and without reference to the initial point on the one hundredth meridian of west longitude, as now provided by law, in a continuous completed line, until they shall meet and connect with the Central Pacific Railroad Company of California; and the Central Pacific Railroad Company of California, with the consent and approval of the Secretary of the Interior, are hereby authorized to locate, construct, and continue their road eastward, in a continuous completed line, until they shall meet and connect with the Union Pacific Railroad."

Defendant contends that the changes wrought by the act of 1866 were such that the Central Pacific Company's title to the Plaza cannot antedate that act. The significance of this is apparent when reference is made to the date of Lake's patent, August 10, 1865. Supporting this contention, defendant argues:

(1) That the company may have failed to file its map within two years after July 1, 1862, and thus having failed to comply with the conditions of the grant of that date, Congress, acting within its undoubted power, extended further opportunity by the act of 1866, and again opened to the company the route east of California.

(2) If the right to continue construction was derived from the act of 1862, there was no need of the later act.

(3) The only map before the court was not filed until 1867, and could only relate back to the last act in effect regarding the right of way, which was the act of 1866:

"When a new act supersedes the first one before the right of way is located, the route when located can only relate back to the superseding act."

(4) The act of 1866 speaks in the present tense, thus:

"And be it further enacted * * * the Central Pacific Railroad Company, with the consent and approval of the Secretary of the Interior, are hereby authorized to locate, construct and continue their road eastward."

The act of 1866 was a new grant of a right of way in different terminology, and under different conditions. In the act of 1862, completion across California was a prerequisite to continuation; in the act of 1866 this condition was dropped, and a new requirement of the consent and approval of the Secretary of the Interior was imposed.

[4] The testimony does not show that the railroad company failed to file its map within two years after July 1, 1862, as required by section 7 of the act of that date; but, if such was the fact, it is nowhere provided that such a default shall work a forfeiture. In section 17 there is a provision for forfeiture in case the roads are not completed by July 1, 1876. The government also reserved the power to complete the lines and reimburse itself out of the income, in case of a failure to comply with the terms and conditions of the act by not completing the road within a reasonable time. In the act of 1866 there is no intimation that the company failed to comply with the terms and conditions inserted in previous statutes, or that the map provided for in section 7 of the act of 1862 had not been filed. Failure to file the map had nothing to do with title to the right of way. The most cursory examination of section 7 shows that the map was required in order to supply information upon which the Secretary of the Interior could withdraw lands from pre-emption, private entry and sale. Delay in filing the map postponed withdrawal, and thus afforded settlers a longer time within which to acquire from the government odd-numbered sections which otherwise would have vested in the company under section 3. Central Pac. R. R. Co. v. Dyer, 1 Sawy. 641, Fed. Cas. No. 2,552; Stuart v. Union Pac. R. R. Co., 227 U. S. 343, 33 Sup. Ct. 338, 57 L. Ed. 535; Id., 178 Fed. 753, 103 C. C. A. 89; Oregon Short Line R. R. Co. v. Quigley, 10 Idaho, 770, 80 Pac. 401, 404.

[5] Whatever right to the Plaza the railroad company derived from congressional grant must date from the act of July 1, 1862. The acts of 1864 and 1866 purported to be amendatory only. They were passed in pursuance of the power reserved by Congress in the first act (section 18) to "add to, alter, amend, or repeal this act" at any time, provided it was done with due regard to the rights of the company.

The three acts deal with the transcontinental railroad, extending from a designated point on the 100th meridian to a terminus on the Pacific Coast at or near San Francisco or the navigable waters of the Sacramento river. Neither of the amendatory acts contemplated any change in the original route. The act of 1864 authorized the Central

Pacific Railroad Company, after reaching the eastern boundary of California, to extend its road eastward 150 miles on the "established route." If there was then an established route, it could have been established only under the act of 1862, which authorized the company to continue construction through the territories of the United States until the roads met and connected. The right to so continue eastward was restored in the act of 1866. The wisdom of allowing the Union Pacific to continue westward and the Central Pacific to continue eastward, subject to the approval and consent of the Secretary of the Interior, was amply demonstrated subsequently, when each manifested an inclination to continue on its way without meeting.

The requirement in the act of 1862 that the Central Pacific should complete its road to the Nevada-California line before proceeding eastward was not so much a contractual or statutory obligation as a physical and economic condition, which at that time Congress could no more eliminate than it could eliminate the mountains or the desert.

The obvious design of the statute of 1866 was to remove a restriction on the eastward progress of the Central Pacific Railroad beyond a point 150 miles east of the western boundary of Nevada, which by some indirection or misunderstanding had found a place in the act of 1864. This is fully explained in the Congressional Globe for 1865–66, at pages 3261 and 3422.

If Congress had intended to recall or declare forfeit the right of way granted July 1, 1862, and to substitute therefor a new grant, not effective until July 3, 1866, and thus subject the company to the delay and expense of condemnation proceedings to secure passage over lands which during that interval had been located in advance of the construction of the road, it is highly probable that such a purpose would have been clearly and explicitly stated, and not left to be deduced by uncertain and questionable implications from the slightly varying terminology of the several acts.

I am unable to discover any justification for such a theory in the circumstance that in the act of 1866 the company was authorized to continue eastward, with the consent and approval of the Secretary of the Interior. 36 Cyc. 1084; Stuart v. Union Pac. R. R. Co., 178 Fed. 753, 763, 103 C. C. A. 89.

Union Pac. Ry. Co. v. Harris et al., 215 U. S. 386, 30 Sup. Ct. 138, 54 L. Ed. 246, on which defendant relies, is not a parallel case, and its authority is much weakened by subsequent decisions in Union Pac. R. R. Co. v. City of Greely, 189 Fed. 1, 110 C. C. A 571, and Stuart v. Union Pac. R. R. Co., 178 Fed. 753, 103 C. C. A. 89; Id., 227 U. S. 342, 33 Sup. Ct. 338, 57 L. Ed. 535. In the Harris Case the court had under consideration rights of way granted to the Leavenworth, Pawnee & Western Railroad Company, the name of which was changed to Union Pacific Railroad Company, Eastern Division, and thereafter to Kansas Pacific Railway Company. In section 9 of the act of 1862 that company was granted a right of way from the mouth of the Kansas river to the initial point of the Union Pacific on the 100th meridian in Nebraska. In the act of 1864 (section 12) the company was authorized to construct its road from the mouth of the Kansas

river so as to connect with the Union Pacific Railroad at any point west of the 100th meridian; in aid of so much of its road and telegraph line as should be a departure from the route provided for in the act of 1862, special provision was made; and by the act of 1866 the connection with the Union Pacific was required to be made, but at a point not more than 50 miles west from the meridian of Denver. After the passage of each act the company filed a map of its then proposed line. The second route was placed west of the first, and the third still further west toward Denver; but the initial point, the eastern terminus, was the mouth of the Kansas river in each case. The land involved in the Harris Case, crossed by the last route, was in Saline county, Kan., 45 miles west of the second proposed line. This tract had been entered as a pre-emption claim prior to July 1, 1862, and in 1865 was transmuted into a homestead entry, which could lawfully be done without breaking the continuity of the claim. The court held that the company's right of way across the Harris tract must date from the act of 1866.

In the Greely Case the lands over which the Union Pacific Railroad Company, Eastern Division, claimed a right of way were situated in Weld county, Colo., and had been settled and entered in June, 1865, under the pre-emption act. The court held that the act of 1866 contained no grant either of lands or right of way; it simply extended the time in which to file the map showing the general route of the road, and fixed the most westerly point at which the road could connect with the main line of the Union Pacific; hence if the lands in question were unappropriated public lands on July 2, 1864, the company's right to a way 400 feet in width over them was undeniable, and all persons acquiring title to, or rights in, any such lands after that date, took subject to such right of way.

In Stuart v. Union Pac. R. R. Co., 178 Fed. 753, 103 C. C. A. 89, and 227 U. S. 342, 33 Sup. Ct. 338, 57 L. Ed. 535, the land claimed to be subject to a right of way was situated near Denver, Colo.; to it Stuart's grantor had initiated a pre-emption claim by settlement and filing a declaratory statement June 16, 1866, a little over two weeks before the passage of the act of 1866. The Circuit Court of Appeals for the Eighth Circuit considered that the company's right of way could not rest on the act of 1862 alone, because the land was west of the 100th meridian, which by that act was fixed as the western terminus of the road; that the terms of the act of 1866 were "restrictive rather than creative or expansive, and indicative of a purpose to limit or confine an existing option or privilege"; that the right to a way over the land must be referred to section 9 of the act of 1864, and the company's title thereto must be regarded as effective from the date of that act, which preceded by almost two years the title which Stuart was asserting. This decision went to the Supreme Court of the United States on writ of certiorari, and was there affirmed.

Neither the act of 1864 nor the act of 1866, contemplated any change in the route of the Central Pacific Railroad through Reno, or along the Truckee river, or for 150 miles east of the eastern boundary of California. In contrast, the act of 1864 permitted the Union Pacific

Railroad Company, Eastern Division, to shift its route westward, without limit. The act of 1866 designated a point beyond which such shifting would not be permitted. In the present case, the act of 1864 fixed a point far east of Reno beyond which the Central Pacific Railroad could not proceed eastward to meet the Union Pacific. The act of 1866 removed the limitation.

[6] The right of way granted in the second section of the act of 1862 is through the public lands, without reservation or exception. In section 3, in aid of the construction of the road, there are granted certain odd-numbered sections of public land "not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached, at the time the line of said road is definitely fixed." Both have been construed as grants in præsenti, yet there is a marked difference between them. Rights to such odd-numbered sections, initiated and attaching subsequent to the passage of the act and before the line of the road was definitely fixed, were valid as against the grant made in section 3, but invalid as against the right of way in section 2. The reason for this is obvious. The act was passed during the Civil War, when the measure was believed to be essential to the preservation of our Pacific Coast possessions. To that end the government essayed to encourage and speed the construction of a transcontinental railroad, and also to induce settlement of the vacant lands along the way. Both alike were needful to the accomplishment of the larger purpose of the act. It is safe to assume that Congress designedly imposed the exceptions to the land grant in order to encourage settlement, and refrained from making any exceptions or reservations to the right of way in order to facilitate speedy construction of the road. Apparently all public lands along the line of the road were subject to the grant in section 2, but less than all to the grant in section 3. The phraseology of section 3 indicates that Congress was of the opinion there could be public lands which had been reserved, and also public lands to which pre-emption or homestead claims had attached, otherwise the exceptions are superfluous.

"The exception of a particular thing from general words, proves that, in the opinion of the lawgiver the thing excepted would be within the general clause, had the exception not been made." Brown v. Maryland, 12 Wheat. 438, 6 L. Ed. 678.

Again, in Gibbons v. Ogden, 9 Wheat. 1, 190 (6 L. Ed. 23), Judge Marshall says:

"It is a rule of construction, acknowledged by all, that the exceptions from a power mark its extent; for it would be absurd, as well as useless, to except from a granted power that which was not granted, that which the words of the grant could not comprehend."

If this rule is applied, lands in the path of the road, to which preemption or homestead claims had attached, might nevertheless be public lands, and subject to the right of way granted in section 2. If, however, the exceptions were inserted out of an abundance of caution, it would indicate apprehension that the term "public lands," as used in

section 3, might by the courts be construed so broadly as to include and comprehend all lands title to which still remained in the government. Be this as it may, the fact still remains that the right of way grant is made without express reservation or exception, and we are not at liberty to read the exceptions of section 3 into section 2. The failure to include them in section 2 suggests that the lawmakers intended to grant the right of way regardless of the exceptions mentioned in section 3. Stuart v. Union Pac. R. R. Co., 227 U. S. 342, 353, 33 Sup. Ct. 338, 57 L. Ed. 535; United States v. Hanson, 167 Fed. 881, 886, 93 C. C. A. 371; Railroad Co. v. Baldwin, 103 U. S. 426, 430, 26 L. Ed. 578.

In Kindred v. Union Pac. R. R. Co., 168 Fed. 648, 652, 94 C. C. A. 112, a right of way case, the Circuit Court of Appeals for the Eighth Circuit, discussing this statute, said that the application of the exceptions exclusively to the land grant indicated the intention of Congress to give a right of way across all lands without exception, so far as it was within its power to do so. The case was subsequently taken to the Supreme Court of the United States, where the decision of the Circuit Court of Appeals was affirmed, 225 U. S. 582, 32 Sup. Ct. 780, 56 L. Ed. 1216. It was held that the term "public land" could be construed, so as to include Indian lands allotted in severalty to the Indians, and that such lands were subject to the right of way granted in section 2. This conclusion was based on the provision in section 2 that the United States should extinguish as rapidly as might be the Indian title to all lands required for the right of way, implying that the Indian lands, as to which Congress properly could grant a right of way, were intended to be included, whether public lands or not. Notwithstanding the act of May 30, 1854, reserving the sixteenth and thirty-sixth sections in each township for school purposes, it was held that those sections in Nebraska were subject to the right of way grant in section 2 of the act of 1862. Union Pac. Ry. Co. v. Karges (C. C.) 169 Fed. 459.

[7] These two cases seem to me to mark the extreme limit which the courts have reached in construing the right of way grant. The grant is out of the public lands, and to the public lands it is restricted. Many cases have been cited in which congressional grants have prevailed over the rights of bona fide settlers on the public domain; but such cases present no serious difficulty, if we bear in mind the difference between public lands and government owned lands.

One of the earliest and most instructive discussions of the right of a settler who has come short of securing a vested right in lands not yet offered for sale is presented in the Yosemite Valley Case (Hutchings v. Low) 15 Wall. 77, 21 L. Ed. 82. The facts in that case are these: Hutchings in May, 1864, was living with his family in Yosemite Valley on a tract of unsurveyed land, on which he had buildings, fences, and cultivation. He intended to enter it under the pre-emption act, but in June, 1864, Congress granted the whole valley to the state of California in trust for a public resort. Act June 30, 1864, c. 184, 13 Stat. 325. The Supreme Court of California (41 Cal. 634) and the Supreme Court of the United States both held that Hutchings' claims

to the land were wholly defeated by the act of Congress; that nothing short of a vested right in the land could avail him against the grant. Mere entry on the land, with continued occupation, gives no vested interest; it may, however, under the statute, give a privilege of pre-emption, which is nothing more than a privilege to purchase the land in preference to others, when and in case it is offered for sale in the usual manner. The land on which Hutchings settled had never been offered for sale, and, furthermore, Congress by the grant had actually withdrawn it from sale; for this there was ample authority. The pre-emption act was not "intended to deprive Congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use." 15 Wall. 87, 21 L. Ed. 82. Claiming he had done everything he could to perfect his title, Hutchings invoked the well-established principle that:

"When an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by misconduct or neglect of a public officer, the law will protect him."

The response was that the claim of pre-emption can never arise when the law does not provide for the sale of the property. Hutchings was unable to acquire title, because the land had been withdrawn from sale and granted to another. This was due, not to the neglect or misconduct of a public officer, but to the action of Congress. The court drew a distinction between acquisition by the settler of a legal right to lands occupied by him as against the owner, the United States, and acquisition by him of a legal right as against other parties to be preferred in its purchase, when the United States has determined to sell. As against the government, his rights are to be measured by the acts of Congress, not by what he may or may not do. There must be settlement and entry in the land office to defeat a congressional grant; but prior settlement, residence, and occupation are sufficient to confer a pre-emption right or privilege to purchase, as against other purchasers under the general law, when the land is finally open for sale, provided the privilege is promptly exercised.

The grant in the Hutchings Case was not restricted to the public lands. The words of the congressional grant were:

"There shall be and hereby is granted to the state of California the 'cliff' or 'gorge' in the granite peak of the Sierra Nevada Mountains, * * * and known as the Yo Semite Valley, with its branches or spurs, in estimated length fifteen miles, and in average width one mile back from the main edge of the precipice on each side of the Valley."

To the same effect see Hutton v. Frisbie, 37 Cal. 475, 491; United States v. Hanson, 167 Fed. 881, 886, 93 C. C. A. 371; Buxton v. Traver, 130 U. S. 232, 9 Sup. Ct. 509, 32 L. Ed. 920.

Unquestionably the grant in section 2 of the act of 1862 was a right of way through public lands only. If Congress intended to give a right of way across all lands, without exception, to the full extent of its power, such an intention could and would have been clearly and aptly expressed. The term "public lands" has been and is habitually employed in our legislation to designate "such lands belonging to the government as are subject to sale or other disposal under general laws."

Newhall v. 'Sanger, 92 U. S. 761, 763, 23 L. Ed. 769; Barker v. Harvey, 181 U. S. 481, 490, 21 Sup. Ct. 690, 45 L. Ed. 963; Bardon v. Northern Pac. R. R. Co., 145 U. S. 535, 538, 12 Sup. Ct. 856, 36 L. Ed. 806; Mann v. Tacoma Land Co., 153 U. S. 273, 284, 14 Sup. Ct. 820, 38 L. Ed. 714.

Pre-emption claims were not allowed on unsurveyed public lands generally, or in Nevada, until the passage of the act of June 2, 1862. 12 Stat. p. 413, c. 95; 12 Stat. p. 410, § 7; St. Paul, Minn. & Man. Ry. Co. v. Donohue, 210 U. S. 21, 28 Sup. Ct. 600, 52 L. Ed. 941. It is therefore questionable, to say the least, whether any pre-emption claim could attach to the land, or whether Lake could initiate any right thereto under the pre-emption law until June 2, 1862, 29 days before Congress granted the right of way.

[8] Plaintiffs and defendant have stipulated that the Plaza was a part of the public lands of the United States July 1, 1862, "unless Myron Lake had acquired a right therein whereby said land ceased to be public land within the meaning of section 2 of said act of Congress." It is unreasonable to assume that Lake's pre-emption entry, made in the land office March 4, 1864, could have a retroactive effect in and of itself, sufficient to overcome or stay the operation of the right of way grant of July 1, 1862; consequently, if on that date the Plaza had ceased to be public land, and therefore was not subject to the right of way grant, it was because of something which Lake had done prior to the passage of the act.

[9] There is no evidence that a map of definite location was filed by the company with the Commissioner of the General Land Office prior to 1867; hence, notwithstanding the fact the land lies within an odd-numbered section, it was at all times between June 2, 1862, and 1867, subject to pre-emption by Lake, and could not have been claimed by the company under its land grant. But as to the right of way grant, the conditions were different. If the land had not ceased to be public land July 1, 1862, it was subject to the right of way grant, and the easement attempted to be created by the act was not lost or impaired by the failure of the land office to include in Lake's patent an express reservation of such an easement. The statute creating the grant was as much a part of the patent as though it had been written therein. Lewis v. Rio Grande W. Ry. Co., 17 Utah, 504, 54 Pac. 981. A congressional grant is one of the highest muniments of title; in dignity, obligation, and effectiveness it is quite equal to a patent issued out of the land office. Whitney v. Morrow, 112 U. S. 693, 5 Sup. Ct. 333, 28 L. Ed. 871.

[10] The right of way grant antedated Lake's patent nearly three years, and must prevail unless it be shown that the patent, in so far as it purports to convey title to the Plaza, is based on a prior equity. That the burden of establishing the existence of such an equity rests on the defendant is clear, and the equity must be proven, if at all, by competent evidence. Megerle v. Ashe, 33 Cal. 74.

[11] The proof offered by defendant consists of Lake's two declaratory statements, the affidavits accompanying them, and other documents tending to show the regularity of the proceedings in the land

office. The statement is not conclusive evidence of the facts it recites as against plaintiffs, who are claiming adversely to the pre-emption, and under the earlier right of way grant. It is competent evidence of the fact that the pre-emption claim was made and entered by Lake in the land office at Carson, March 3, 1864, and that an amended statement was filed in the same office August 3, 1864. It was an essential link in the chain of his title, but when the existence of the facts recited, or the correctness of inferences drawn from them, is challenged, they are no more than ex parte statements by an interested party; and a person claiming under an adverse title procured by another and a different course of procedure is not estopped from showing the truth by ordinary evidence. Megerle v. Ashe, 33 Cal. 74, 85; Uinta Tunnel M. & T. Co. v. Creede C. C. Min. & M. Co., 119 Fed. 164, 169, 57 C. C. A. 200; McCorkell v. Herron, 128 Iowa, 324, 103 N. W. 988, 111 Am. St. Rep. 201, 204.

[12] As no rights are claimed for Lake, except under the pre-emption act, it will be necessary to review some of the salient features of the law controlling pre-emption entries. The pre-emption act was adopted September 4, 1841 (5 Stat. 455, c. 16), and repealed March 3, 1891 (26 Stat. 1097). Under that act every qualified person who—

"has made or shall hereafter make a settlement in person on the public lands" subject to pre-emption, "and who shall inhabit and improve the same, and who has or shall erect a dwelling thereon, * * * is authorized to enter with the register of the land office for the district in which such land may lie, by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land."

The settler, having settled and improved a tract of land subject to pre-emption, was required—

"within thirty days after the date of such settlement, [to] file with the register of the proper district a written statement, describing the land settled upon and declaring his intention to claim the same under the pre-emption laws."

Failing to file such a declaration within the time specified, the land was subject to entry by any other purchaser. If the land was unsurveyed, the pre-emption claimant was required to file his declaratory statement within three months from the date of the receipt at the district land office of the approved plat of the township, giving a description of the tract and the time of settlement. Rev. St. §§ 2264, 2265.

It may be conceded that, when such a declaratory statement is filed in the proper land office, it is notice to the world that the land is set apart and is subject to the pre-emptioner's option to purchase, so long as he complies with the provisions of the law and the regulations of the land office. The tract thus entered is severed from the mass of public land, and so remains until the entry is canceled or forfeited; in that event, the land reverts to the government, and again becomes subject to entry. The rights acquired by a pre-emptioner on unsurveyed land prior to entry in the land office depend on circumstances. If not made for the purpose of establishing and maintaining a home, temporary residence and improvements on the land do not create any

valid claim under the pre-emption law. Central Pac. R. R. Co. v. Hunsaker, 27 Land Dec. 297; Tarpey v. Madsen, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042; Hastings, etc., R. R. Co. v. Whitney, 132 U. S. 357, 361, 10 Sup. Ct. 112, 33 L. Ed. 363.

There are numerous decisions of the Supreme Court to the effect that no vested right attaches to a tract until there has been an entry in the local land office. When a settler has filed his declaratory statement, and "performs certain other acts prescribed by law, he acquires for the first time the right of pre-emption to the land; that is, a right to purchase it in preference to others." Buxton v. Traver, 130 U. S. 232, 235, 9 Sup. Ct. 509, 510 (32 L. Ed. 920); Northern Pac. R. R. v. Colburn, 164 U. S. 383, 386, 17 Sup. Ct. 98, 41 L. Ed. 479; Lansdale v. Daniels, 100 U. S. 113, 116, 25 L. Ed. 587; Maddox v. Burnham, 156 U. S. 544, 15 Sup. Ct. 448, 39 L. Ed. 527; Kansas Pac. Ry. Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Hastings v. Whitney, 132 U. S. 357, 362, 10 Sup. Ct. 112, 33 L. Ed. 363; Sioux City, etc., Land Co. v. Griffey, 143 U. S. 33, 40, 12 Sup. Ct. 362, 36 L. Ed. 64; Tarpey v. Madsen, 178 U. S. 215, 224, 20 Sup. Ct. 849, 44 L. Ed. 1042. It will be assumed, as defendant contends, that the foregoing rule gives way when the land settled upon is unsurveyed, and a qualified pre-emptioner, intending at the time to acquire it in good faith from the government under the pre-emption act, performs such acts as will give reasonable and definite notice of the extent and identity of his claim.

[13] It is unreasonable to suppose that as against other persons desiring to settle on the land, or as against a right of way grant, the right of a pre-emptioner on unsurveyed land is in the nature of a float. It is essential, as Justice White says in Railroad Co. v. Donahue, 210 U. S. 21, 28 Sup. Ct. 800, 52 L. Ed. 941, that the settler "does such acts as to put the public upon notice of the extent of his claim"; otherwise, prior to the time when his declaratory statement must be filed in the land office, he will be able to defeat every attempt of any other qualified person to settle any land within a radius of three-quarters of a mile from the 40 on which his house is located.

[14] It certainly was not the intention of Congress, in permitting pre-emption claims on unsurveyed land, to grant any right so extensive. Under the long-established practice of the land department, when a settler is unable to file a declaratory statement, because the land is unsurveyed, or because there is a vacancy in the office of register or receiver, or both, "the notice effected solely by improvements upon the land is confined to the land within the particular quarter section on which the improvements are situated." St. Paul, Minn. & Man. Ry. Co. v. Donohue, 210 U. S. 21, 28 Sup. Ct. 600, 52 L. Ed. 941; Kenny v. Johnson, 25 Land Dec. 394; Sweet v. Doyle, 17 Land Dec. 197; Union Pac. R. R. Co. v. Simmons, 6 Land Dec. 172; United States v. Central Pac. R. Co., 94 Fed. 906, 36 C. C. A. 546.

In Brown v. Central Pac. R. R. Co., 6 Land Dec. 151, it was held that a right acquired by settlement, in the absence of any claim of record or otherwise, is confined to the limits of the quarter section in which the settlement is made, and that the settlement right existing at

the date when the railroad land grant became effective excepts the land covered thereby from the operation of the grant. But if, as he is permitted to do, he settles on a tract of unsurveyed land which lies in two or more contiguous quarter sections, the settler can defeat an attempted settlement by another before the time when record notice is required (1) by improvements on each subdivision of the land outside of the quarter section on which he has settled; (2) by actual notice to an intruder of the extent of the settlement claimed (see authorities cited above); and (3) by notices defining the extent of the settlement claimed, posted on subdivisions thereof outside of the technical quarter section on which the improvements are placed. Driscoll v. Doherty, 25 Land Dec. 420, 424; Smith v. Johnson, 17 Land Dec. 454; Sweet v. Doyle, 17 Land Dec. 197, 198.

Inasmuch as Lake was unable to file his declaratory statement before March, 1864, and the statute reserved to him the right to do so, it was his duty in the meantime to perform such acts as would put the public upon notice of the extent and identity of his claim. Defendant has failed to show that this was done. The testimony introduced by plaintiffs shows that Lake had no improvements whatever on the northeast quarter of section 11, the quarter in which the Plaza is located, prior to 1865. The testimony offered by plaintiffs to this effect is not in conflict with defendant's showing in Lake's declaratory statements. The recital in the declaratory statements that Lake settled on the tract of land claimed in 1861, and that in 1864 when he made his declaratory statements he intended to claim the land as a pre-emption, and the further fact that he had no improvements on the Plaza prior to 1865, may all be true.

There was no finding of fact by the officials of the land department that Lake's settlement was made in 1861, nor was such a finding required. The first declaratory statement shows that he then settled and improved a tract of land situated in three different quarter sections, but there is no finding that Lake ever settled or improved, or intended to pre-empt, the Plaza, or the quarter section in which it is located, prior to the date of the first declaratory statement; nor is there anything therein, or in the affidavits, to that effect. Furthermore, Lake never declared on lot No. 9 in the S. E. $\frac{1}{4}$ of section 11, until August 3, 1864, four months after the approved plat of the township was filed in the local land office. This indicates that, even after the approved plat of the township had been filed in the local land office, Lake was still uncertain as to what land he would include in his pre-emption claim.

[15] To plaintiffs' oral evidence, showing that prior to 1865 Lake neither resided on nor had made any improvements on the quarter section in which the Plaza is located, defendant expressly objected, arguing that there is no precedent for such a question being raised 50 years after the issuance of a patent. This objection is not particularly impressive, in view of the conceded fact that the city of Reno for 20 years after 1879 paid an annual rental to the railroad company for the use of the northeast corner of the Plaza, and in 1907 and 1908 assessed to and collected from the railroad company $5,992.65, one-half the cost of paving the streets bounding the Plaza. Apparently the city never seri-

257 F.—30

ously asserted any title or exclusive right to the Plaza until it caused the land to be plowed in March, 1916, 53 years after the right of way grant. It is difficult to understand how the company prior to 1916 could be negligent in failing to bring a suit to quiet title, or an action in ejectment.

[16] Defendant also urges, in opposition to the admission of this testimony, that the land office records control, and oral evidence is not admissible on either side. In support of this proposition the case of Tarpey v. Madsen, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042, and 17 Utah, 352, 53 Pac. 997, is cited. In that case Tarpey was claiming under a railroad land grant, which took effect on the land in controversy November 28, 1868, when the map of definite location was filed in the proper office. Madsen did not settle on the land until 1888, or make his homestead entry until 1896. In order to show that his entry was properly received by the register, he attempted to prove that the land, though in an odd-numbered section, had been withdrawn from the operation of a grant by a pre-emption entry made by one Olney in May, 1869. The grant antedated this entry. Olney's declaratory statement fixed the date of his settlement as April, 1869. This, also, was subsequent to the filing of the map of definite location; so Madsen produced testimony to show that Olney's settlement was actually made early in 1868, before the filing of the map of definite location. This testimony seems to have enabled him to prevail in the land department, and also in the state courts of Utah, though there was no claim that Madsen had succeeded to Olney's rights; Olney having abandoned the claim soon after making his pre-emption entry.

The Supreme Court of the United States held that, even if Olney had settled prior to the filing of the map of definite location, that fact alone was insufficient to withdraw the land from the operation of the railroad grant, because there was no proof that his settlement was with intent to acquire title from the United States. The court then argued that both parties should be held to the record. The whole trend of Mr. Justice's Brewer's argument was toward the conclusion that the date when the map of definite location was filed with the Commissioner of the General Land Office should mark the inception of the company's right, and that the date when the settler's entry was made in the local land office should be regarded as the time when his right attached. That this was his theory is shown by his reply to the objection that such a rule would ignore the privilege given to temporary occupants of the land to make entry within a short time. Furthermore, he limited the application of the rule to controversies similiar to that between Tarpey and Madsen. The case at bar is not such a controversy.

In a controversy, said the court, between two occupants of a tract open to pre-emption and homestead entry, relative rights are not determined by the mere time of filing the respective claims in the land office, but by prior occupancy, which may be established by oral testimony. But in a controversy between a railroad holding under a land grant, and an individual entryman, the question of right, according to decisions of the Supreme Court since 1882, rests, not on the mere matter of occupancy, but on the record. In decisions prior to that date, it

was considered that the line of the "road is definitely fixed" when it is surveyed and marked out on the ground. As a general rule, that fact could only be established by oral testimony.

The uncertainty and instability of titles resting on oral testimony led to the adoption of the rule, since unquestioned, that the line of the railroad could only be regarded as definitely fixed when the map of definite location is filed with the Commissioner of the Land Office. This eliminated oral testimony on that point, and also suggested that the rights of the settler in controversy with the railroad company claiming rights under the land grant should hinge on the record; that is, upon his declaration or entry in the local land office.

The objection to plaintiffs' oral testimony as to Lake's improvements prior to 1865 is overruled. Objections to the so-called Lake possessory claim are sustained, because Lake's connection therewith has not been satisfactorily established. Defendant's testimony fails to show that Lake, prior to or on the 1st day of July, 1862, had made any claim to the Plaza sufficient to deprive it of its status as public land or defeat the right of way grant.

Let a decree be entered in favor of plaintiffs.